UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARLA ARAMOUNI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DATAVAULT AI INC., BRETT MOYER, NATHANIEL T. BRADLEY, and GARY WILLIAMS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Carla Aramouni ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Datavault AI Inc. ("Datavault AI" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Datavault AI securities

1

between September 4, 2024 and October 30, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Datavault AI purportedly owns and operates data management platforms including its Datavault Platform, on which users may purchase or sell data tokenized using blockchain technology.  As of the time of this filing, Datavault AI continues to claim that the Datavault Platform enables "organizations [to] turn data into a strategic asset."

3.    Datavault AI was previously known as WiSA Technologies, Inc. ("WiSA").  On September 4, 2024, WiSA issued a press release announcing that it had agreed to acquire the intellectual property of Data Vault Holdings Inc. ("Data Vault Holdings"), including, *inter alia*, the Datavault Platform, for $210 million.  WiSA further announced that, upon closing this acquisition, it intended to change its name to "Datavault Inc." and appoint Defendant Nathaniel T. Bradley ("Bradley") as its Chief Executive Officer ("CEO").  The announcement of Bradley's appointment as the Company's CEO made no mention of the fact that Bradley had previously faced SEC charges for making false statements as Chief Technology Officer for Parallax Health Sciences, Inc. ("Parallax") before settling those charges for a $40,000 fine and a three-year ban from participating in a penny stock offering.  Nor did the Company's announcement disclose that Edward Withrow III ("Withrow"), an individual listed as inventor alongside Defendant Bradley on multiple Data Vault Holdings patents, had a previous felony conviction for making false statements in connection with a pump and dump scheme when he owned and controlled Parallax Diagnostics, Inc., a predecessor entity to Parallax.

2

4.      On February 13, 2025, following its acquisition of the Datavault Platform, WiSA announced that it had changed its name to Datavault AI.

5.      On July 22, 2025, Datavault AI announced a corporate partnership with Burke Products ("Burke"), claiming that the partnership "stands to deliver 2025 Revenues from existing contracts of Burke's that have now been subcontracted to Datavault AI" and that Datavault AI was "uniquely positioned to deliver . . . new and innovative solutions" through "technological synergies" given the defense sector's "increas[ed] focus[] on secure data solutions, advanced tracking, and predictive intelligence".

6.      On September 25, 2025, Datavault AI announced a corporate partnership with Scilex Holding Company ("Scilex"), pursuant to which the Company would receive a "$150 million strategic investment" from Scilex to "build a supercomputer and launch independent data exchanges" in the United States.

7.      On October 28, 2025, Datavault AI announced a corporate partnership with Nature's Miracle Holding Inc. ("Nature's Miracle"), pursuant to which the Company would license its Carbon Credit Tokenization System for a "non-refundable license fee of $2 million and a 35 percent royalty on all gross revenue generated through the licensed technology."

8.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the economic value to Datavault AI of its various corporate partnerships with, *inter alia*, Burke, Scilex, and Nature's Miracle; (ii) Defendants had overstated the volume of trading activity on the Datavault Platform, which was in fact minimal; (iii) the Company's undisclosed connections with Withrow, a convicted felon, when revealed, would cause Datavault AI to incur

3

reputational harm; (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

9. The truth began to emerge on October 31, 2025, when Wolfpack Research published a short report on Datavault AI (the "Wolfpack Report"). The Wolfpack Report alleged, among other things, that Datavault AI was a "stock promotion" that relied on misleading press releases and "empty claims" concerning artificial intelligence, quantum computing, Web 3.0, and data monetization. Wolfpack further alleged that (i) Datavault AI's press releases were filled with promotional buzzwords that did not reflect the Company's actual business operations, (ii) Datavault AI's previously announced purported partnerships could not offer the economic upside that Defendants claimed they would, (iii) Burke's contracts concerned "run-of-the-mill equipment such as hoses, piping, fuses, and electrical connectors", undermining Datavault AI's claim that it was "uniquely positioned to deliver" solutions, and (iv) both Scilex and Nature's Miracle lacked the resources to fulfill their purported commitments pursuant to the partnerships Datavault AI had announced. The Wolfpack Report also questioned the activity on the Company's blockchain marketplace, alleging that Datavault AI's platform had virtually no trading activity. In addition, the Wolfpack Report raised concerns about Datavault AI's leadership and affiliations, including Defendant Bradley's past SEC charges for false statements concerning Parallax and Company leadership's alleged connections with convicted felon Withrow, through both Data Vault Holdings and Parallax.

10. On this news, Datavault AI's stock price fell $0.49 per share, or 19.44%, to close at $2.03 per share on October 31, 2025.

4

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Datavault AI is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Datavault AI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Datavault AI is a Delaware corporation with principal executive offices located at One Commerce Square, 2005 Market Street, Suite 2400, Philadelphia, PA 19103.  The

Company's common stock trades in an efficient market on the Nasdaq Capital Market. ("NASDAQ") under the ticker symbol "DVLT". When Datavault AI was known as WiSA, its common stock traded in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "WISA"

18.    Defendant Brett Moyer ("Moyer") served as Datavault AI's CEO from before the start of the Class Period until December 31, 2024, when he transitioned to Chief Financial Officer, remaining in that role through the end of the Class Period.

19.    Defendant Bradley served as Datavault AI's CEO from December 31, 2024 through the end of the Class Period.

20.    Defendant Gary Williams ("Williams") served as Datavault AI's Chief Accounting Officer from before the start of the Class Period until November 30, 2024.

21.    Defendants Moyer, Bradley, and Williams are collectively referred to herein as the "Individual Defendants".

22.    The Individual Defendants possessed the power and authority to control the contents of Datavault AI's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Datavault AI's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Datavault AI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

23.    Datavault AI and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Datavault AI purportedly owns and operates data management platforms including its Datavault Platform, on which users may purchase or sell data tokenized using blockchain technology.  As of filing, Datavault AI continues to claim that the Datavault Platform enables "organizations [to] turn data into a strategic asset."

25.    Datavault AI was known as WiSA from before the start of the Class Period until February 13, 2025, when it changed its name to Datavault AI after acquiring the intellectual property of Data Vault Holdings including, *inter alia*, the Datavault Platform, for $210 million.

### Materially False and Misleading Statements

26.    The Class Period begins on September 4, 2024, when WiSA issued a press release announcing the $210 million purchase of Data Vault Holdings' intellectual property including, *inter alia*, the Datavault Platform.  In this press release, WiSA claimed that the Datavault Platform "creates value through scarcity, utility, and encrypted data protection and generates revenue through licensing partnerships".

27.    Also in this press release, both Defendants Moyer and Bradley touted Defendant Bradley's purported "exceptional track record of successfully commercializing IP for five companies over 30 years", while omitting Defendant Bradley's past SEC charges for false statements concerning Parallax and subsequent three-year ban from participating in penny stock offerings, stating *inter alia*:

> "This exciting transaction leverages our public company structure, creating a larger, more dynamic entity with broad reach in multiple, rapidly growing markets," said

7

Brett Moyer, CEO of WiSA Technologies. "Datavault's substantial IP portfolio significantly amplifies our spatial audio technology and adds powerful HPC assets. Further, *Nate Bradley brings his exceptional track record of successfully commercializing IP for five companies over 30 years*. . . ."[1]

Nathaniel T. Bradley, CEO and co-founder of Data Vault Holdings, said, "I have repeatedly monetized patent portfolios via licensing models. Now, our Data and Acoustic Sciences are ready for commercial expansion. Already, our applications, including secure tokenization, data ownership and digital twin, have attracted reputable users, and our increased industry awareness positions us to expand our customer base."

28.     Finally, in this press release, WiSA announced that it would change its name to "Datavault Inc." upon closing of the $210 million deal, which depended on shareholder approval as it was comprised of, *inter alia*, $200 million in the form of newly issued WiSA restricted common stock.

29.     On November 15, 2024, WiSA held a conference call to discuss its financial results for the fiscal quarter ended September 30, 2024, as reported on a Form 10-Q it had filed with the SEC one day earlier. During this call, Defendant Bradley discussed his background but omitted any mention of past SEC charges for making false statements during his time at Parallax Health Sciences, stating *inter alia*:

My background for those that don't know me is centered around invention. I have successfully taken products from invention to commercialization and into the public markets. Over my life span, I've had various timings that I have figured out with respect to this. You get better in life or at least you intend to, and this current opportunity follows really a career that is highlighted by our solution of the Internet for people with disabilities at Audioeye, my previous company, ticker AEYE, NASDAQ-traded company. We solve for making mobile and Internet sites accessible for those with disabilities.

30.     Later during this call, when asked about the "near-term monetization drivers" on which he was "most focused" or conceived of as "most meaningful", Defendant Bradley touted

---

[1] All emphases herein have been added unless otherwise indicated.

the purported commercial value of the Datavault Platform in visualizing scientific data and serving as an exchange on which users could sell data, stating *inter alia*:

> Datavault, the high science, the ability to use the holograms of HYPERVSN that we are — with the DVHolo brand, bringing a pay-per-view gateway experiential layer around the use of holograms and high science. So, that's using scientific data that we proved and showed at an exhibit at the Digital Twin Institute that we were able to show a plant being grown off of the data into it. So, you see a sun cycle into a seed. . . . ***Datavault is focused on an exchange. We have the ability with our information data exchange to simplify all of that business into an exchange. We sell data on behalf of our clientele in a safe and secure environment that's never existed before on our information data exchange. So, [that is] the focal point[], . . . the information data exchange*** . . . .

31.     Defendant Bradley was next asked "how do you actually monetize [the Datavault Platform]", to which he responded, "partnerships on the buy and sell side", claimed that the Datavault Platform was "the flagship property of WiSA-Datavault [AI]", and conceded that any monetization from the Datavault Platform would flow from transactions actually executed on it, stating *inter alia*:

> ***[P]artnerships on the buy and sell side***.  So, you will see a number of clients sign into the platform. ***We're at the commercialization stage of Data Vault. It's the flagship property of WiSA-Data Vault***. . . . ***[T]he monetization, to answer your question, on the information data exchange, you could expect a 70-30 split, 30% of the yield of a trade, think of it as 15% buy-side, 15% sell-side interest in that data set comes back to our company***.  So, a 70-30 split, 30% coming to Data Vault, 70% in the pocket of our client, where we've taken, like Bloomberg does, a terminal, and we have a virtual meta terminal that we turn up for our clients called Datavault. [a]nd what we add for our clients to their data sets is a meta layer that adds value.  So, we value and score.

32.     On January 7, 2025, WiSA announced it had closed its purchase of Data Vault Holdings' intellectual property, including the Datavault Platform, and named Defendant Bradley as CEO and Director.  This press release quoted Defendant Moyer as touting Defendant Bradley's credentials as a "technology visionary with the experience of successfully launching multiple publicly traded companies", stating *inter alia*:

9

Brett Moyer, CFO of WiSA Technologies, said, "***Nate is a technology visionary with the experience of successfully launching multiple publicly traded companies***. I resoundingly welcome him as incoming CEO and director to create value for our shareholders. Datavault has been advancing its technology and strategic relationships since its founding six years ago, building value in the process. Now, we have a more diversified portfolio of assets and broad reach into multiple markets that are expected to exceed $4 billion in annual sales."

33.     On February 13, 2025, WiSa announced it had changed its name to Datavault AI. In this press release, Defendant Bradley claimed that the Company was "well-positioned to realize partnering opportunities and grow the business across multiple vertical markets in 2025 and beyond."

34.     On May 20, 2025, Datavault AI held its Business Update Conference Call. During this call, Defendant Bradley made several claims concerning the purported importance to the Company of its blockchain marketplace, the Datavault Platform. For example, Defendant Bradley specifically represented that Datavault AI was "the center of [Defendants'] strategy", stating *inter alia*:

> Our business model, as you know, is a licensing company. ***At the center of our strategy is really this agent platform, the Datavault***, which allows you to experience data, view data, see data from all of its sources, taking in data in a Web 3.0 format, where all Web 2.0 formats, such as video and telecom and things that were not traditional data sources, are able to be seen, viewed and experienced within the Datavault.

35.     Defendant Bradley further stated that, through Defendants' Datavault Platform, their customers' "ability to use blockchain to reduce costs and to create value" was "being perfected," referencing the Company status as "heavily patented in this area" andstating *inter alia*:

> [R]eally, ***the Datavault Bank capability, which is our ability to issue smart contracts, is a breakthrough capability that we're giving our clients***. Our clients are now able to distribute not only data objects, but they can create data objects in combination. They can have the likeness of a student combined with a brand of a school, and then the single object that is remunerating all the parties in the transaction automatically, systematically. This is the blockchain. ***This is the ability to use blockchain to reduce costs and to create value, for our clientele***. And that's

10

***being perfected through the Datavault platform***.  It's something that we've invested heavily in.  ***We're heavily patented in this area***.  We're exclusive to our clients in these areas that we've perfected around our technology.

36.    Defendant Bradley also claimed that the Datavault Platform enabled Defendants to "monetize" certain technologies they had developed, including "Sumerian crypto anchors" that could purportedly "mark everything from material or textile or piece of clothing or piece of products".  Defendant Bradley specifically affirmed that the veracity of his claims, stating "Sumerian, this can't be overstated", and stating *inter alia*:

> ***Sumerian, this can't be overstated***.  We have with Sumerian crypto anchors, we have an industry first durable, secure, micro, even Nano marking capability, the ability to go down to the molecular level and mark everything from material or textile or piece of clothing or piece of products.  We're able to mark physical metals.  We can mark individual plastics and other substrates using these molecular markers.  We also have perfected a microchip, a micro transponder that allows us to mark everything in an inventory platform.  We can mark inside human tissue.  We've proven the ability to insert this into glass, into plastic.  It survives the heat of molten metal. It can be adhered to bullets, adhered to casings.  ***There's many use cases that we've perfected over the last quarter, where we have done bench testing and extreme testing around these marking technologies, and we're extremely excited about the enterprise level that we've reached to monetize these technologies within the Datavault***.

37.    On July 7, 2025, Datavault AI filed with the SEC a shelf registration statement on Form S-3 concerning one or more eventual offerings of, *inter alia*, common stock, with an aggregate offering price of $250 million.  After an amendment, the SEC declared this registration statement effective on July 9, 2025.

38.    On July 15, 2025, Datavault AI filed with the SEC a prospectus on Form 424B3 announcing an offering of 22,728,368 shares of common stock, issuable upon exercise of certain common stock warrants the Company had previously issued: (1) on September 10, 2024, pursuant to exchange agreements between the Company and holders of the warrants issued on that date; (2) on February 13, 2025, pursuant to a placement agency agreement between the Company and

11

an affiliate of Maxim Group LLC; and (3) in connection with a March 31, 2025 securities purchase agreement between the Company and certain of its investors.  This prospectus stated that shares in the offering would be sold either at market prices or privately negotiated prices.

39.    On July 22, 2025, Datavault AI issued a press release entitled "Global Defense Contractor Burke Products Selects Datavault AI for Enhanced National Defense and Aerospace Technologies Contracts".  In this press release, Datavault AI claimed that its partnership with Burke "stands to deliver 2025 Revenues from existing contracts of Burke's that have now been subcontracted to Datavault AI" and that these contracts existed "on a global basis", stating *inter alia*:

> ***The partnership stands to deliver 2025 Revenues from existing contracts of Burke's that have now been subcontracted to Datavault AI*** and is set to scale into productized offerings into 2026. . . .  ***Within the partnership Datavault AI has been contracted by Burke Products to engineer and produce solutions responsive to an array of opportunities***.  All opportunities are managed under the contract in a case by case fashion designed to be responsive to private and public RFPs and requests made directly and through subcontracts obtained by Burke and other contracting mechanisms in place at Burke Products on a global basis.

40.    Also in this press release, Datavault AI misleadingly touted the expected U.S. defense budget in 2025 and claimed that the Company was "uniquely positioned to deliver . . . new and innovative solutions" through "technological synergies" given the defense sector's "increas[ed] focus[] on secure data solutions, advanced tracking, and predictive intelligence", stating *inter alia*:

> [G]lobal defense spending is projected to exceed $2.2 trillion in 2025, with ***the U.S. defense budget alone expected to surpass $900 billion***.  ***As modernization efforts escalate, the sector is increasingly focused on secure data solutions, advanced tracking, and predictive intelligence—areas where Datavault AI is uniquely positioned to deliver for Burke new and innovative solutions*** that solve for advantages and forward progression of technologies in this sector.  With Web 3.0 centric contributions of Datavault AI this partnership will explore technological synergies with particular emphasis on secure data management, resource tracking, and communication systems critical to mission success.

12

41.    This press release also quoted Defendant Bradley as touting the purported "international" scale of Datavault AI's partnership with Burke Products, which he claimed exceeded what he and his co-founder and spouse Sonia Choi envisioned for Datavault AI upon founding it, stating *inter alia*:

Nathaniel T. Bradley, Co-Founder and CEO of Datavault AI, asserted: "***This collaboration marks an international milestone of a scale we couldn't have anticipated when we first founded the company***. Sonia Choi has been diligently building toward this moment for years, and her ability to identify high-impact applications for Datavault AI's technologies—while guiding our team through the execution with focus and discipline—has been exceptional. ***Through her vision and leadership, we've reached a breakthrough that aligns seamlessly across our VerifyU, ADIO®, High Performance Computing, WiSA and Datavault platforms, in concert with Burke Products' expansive capabilities, trusted network, and precision-driven engineering excellence***. . . . Together, with Burke Products, we now have an industry leading, solutions-oriented contracting partner that not only understands Datavault AI's mission, but is equipped to deliver defense-grade, purpose-built innovations when they are most needed. Sonia's and Aaron [Bakshi, CEO of Burke]'s influence will have a lasting impact—not only on Datavault AI's trajectory, but on the broader U.S. defense industry it serves."

42.    Also on July 22, 2025, Datavault AI filed with the SEC a prospectus on form 424B5 announcing an at the market offering of common stock worth up to $50 million pursuant to a registration statement on Form S-3, in apparent reference to the registration statement the Company filed on July 7, 2025, as alleged *supra* ¶ 37.

43.    On August 22, 2025, Datavault AI held a conference call to discuss its financial results for the fiscal quarter ended June 30, 2025, as reported on a Form 10-Q it had filed with the SEC three days earlier. During this call, Defendant Bradley claimed that Datavault AI's partnership with Burke showed its "ability to monetize inventions", stating *inter alia*:

If you look at the excitement around WiSA, it's about our ability to capture clientele in scale. ***And if you look at*** some of the advancements made with Datavault and the team, ***the ability for Burke Products to name us and select us*** into a government contracting opportunities around key instruments of both our military complex and administrative aspects of our government, ***we have also made a***

13

*growth outlook in our patent licensing strategy and our ability to monetize inventions that we own in the United States*.

44.     On September 25, 2025, Datavault AI issued a press release announcing that it had purportedly secured a "$150 million strategic investment" from Scilex to "build a supercomputer and launch independent data exchanges" in the United States.  The press release stated, in relevant part:

> Datavault AI Inc. . . . a leader in AI-driven data visualization, valuation, and monetization, today announced the execution of a securities purchase agreement for a $150 million strategic investment from Scilex Holding Company (Nasdaq: SCLX).  As described below, the investment will be made in two tranches, with an initial tranche of $8,067,000, expected to close on September 26, 2025, and a second tranche of $141,933,000 expected to close following receipt of stockholder approval as described below.  The transaction, executed in Bitcoin (BTC) at the spot exchange rate published by Coinbase.com, is expected to strengthen Datavault AI's balance sheet and provide growth capital to accelerate its supercomputing infrastructure, expand independent data exchanges, and unlock new revenue streams.

45.     On October 23, 2025, Datavault AI issued a press release entitled "Datavault AI Announces Headquarters Relocation to Philadelphia, Expansion of AI and Quantum Centers, and Advisory Board Growth to Fuel Rapid Innovation."  Among other items, Datavault AI announced that it had opened its Center for AI and Quantum Computing Excellence, which it claimed consisted of "a state-of-the-art, Class A eight-story glass office building spanning 180,000 square feet on 23 wooded acres" and "is optimized for advanced computing with 22,000-square-foot floor plates ideal for collaborative [research and development ("R&D")]", stating *inter alia*:

> [T]he company has opened its Center for AI and Quantum Computing Excellence at 9040 Roswell Road in Sandy Springs, Georgia—a state-of-the-art, Class A eight-story glass office building spanning 180,000 square feet on 23 wooded acres along the Chattahoochee River. Featuring modern high-speed infrastructure and on-site data centers, the lab is optimized for advanced computing with 22,000-square-foot floor plates ideal for collaborative R&D.

46.    On October 28, 2025, Datavault AI issued a press release entitled "Nature's Miracle Crowns Datavault AI with 35% Royalty License with Mult-Million Dollar Global Technology License".  Among other items, Datavault AI stated that Nature's Miracle had agreed to license its Carbon Credit Tokenization System, purportedly for a "non-refundable license fee of $2 million and a 35 percent royalty on all gross revenue generated through the licensed technology."  The press release further quoted Defendant Bradley as touting the value of this purported agreement, stating *inter alia*:

> "***This agreement represents a significant milestone in Datavault AI's ongoing strategy to commercialize our patent portfolio across high-growth industries like sustainability and carbon markets***," said Nathaniel Bradley, CEO of Datavault AI.  "By licensing our carbon credit tokenization system to Nature's Miracle, we are aligning with a partner whose expertise in innovative, sustainable environmental technology is being applied to accelerate the adoption of blockchain for verified carbon markets."  The partnership positions both companies at the forefront of the emerging digital carbon economy by providing a scalable, transparent, and fraud-resistant method for verifying and trading carbon credits.

47.    The statements referenced in ¶¶ 26–27, 29–36, 39–41, 43–46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the economic value to Datavault AI of its various corporate partnerships with, *inter alia*, Scilex, Burke, and Nature's Miracle; (ii) Defendants had overstated the volume of trading activity on the Datavault Platform, which was in fact minimal; (iii) the Company's undisclosed connections with Withrow, a convicted felon, when revealed, would cause Datavault AI to incur reputational harm; (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

48.    The truth began to emerge on October 31, 2025, when Wolfpack Research published the Wolfpack Report, a short report concerning Datavault AI.

49.    The Wolfpack Report alleged, among other things, that Datavault AI was a "stock promotion" that relied on misleading press releases and "empty claims" concerning artificial intelligence, quantum computing, Web 3.0, and data monetization. Specifically, the Wolfpack Report alleged that the Center for AI Press Release had vastly overstated the size of Datavault AI's facility, and that Datavault AI's purported partnerships with, *inter alia*, Burke, Scilex, and Nature's Miracle could not offer the economic upside that Defendants claimed they would. As to Burke, Wolfpack stated that Defendants' claim that Burke is a "[g]lobal [d]efense [c]ontractor" was misleading given that Burke "has never been awarded more than $4.5 million in contracts in any given year going back to 2002" and had only been awarded $3.1 million in contracts in 2025, by the time Wolfpack published its Report. Moreover, Wolfpack noted that Burke's contracts concerned "run-of-the-mill equipment such as hoses, piping, fuses, and electrical connectors", a far cry from the "secure data solutions, advanced tracking, and predictive intelligence" that Datavault AI stated it would be "uniquely positioned to deliver for Burke new and innovative solutions." As to Scilex, Wolfpack noted that even though Datavault AI claimed Scilex would provide it with a "$150 million strategic investment", Scilex had a market cap of less than $150 million and only $4.1 million of cash and cash equivalents. As to Nature's Miracle, Wolfpack stated that Datavault AI's claim that Nature's Miracle would pay the company a $2 million licensing fee seemed dubious at best, given that Nature's Miracle reported only $9,511 in cash as of its Q2 2025 Form 10-Q, the last one issued before Datavault AI announced its purported partnership with Nature's Miracle.

16

50.     The Wolfpack Report further contended that the Datavault Platform was far less active than Defendants' public statements suggested, stating, *inter alia*, that "[t]rading activity on the platform appears to be minimal, if not non-existent":

> It takes almost no effort to discover that [Datavault AI]'s "blockchain" powered platform, Data Vault, is a joke.  We signed up and found that much of the "data" for sale are [non-fungible tokens], like photos of Dr. Oz, Vladimir Putin vomiting, and a Dean's List token for a community college.  Trading activity on the platform appears to be minimal, if not non-existent.  The last known data for sale on the exchange appears to have been uploaded by [Datavault AI] employees attempting to sell widely available historical weather data.

51.     Finally, Wolfpack raised concerns about Datavault AI's leadership and affiliations, including alleged connections with a convicted felon, Withrow.  First, Wolfpack flagged that Datavault AI's website omitted Defendant Bradley's past tenure as Chief Technology Officer of Parallax, during which the SEC charged Defendant Bradley for falsely claiming that Parallax "would have a Covid-19 test 'available soon' and personal protective equipment available for 'immediate sale'" when Parallax was in fact insolvent and unable to deliver on Defendant Bradley's claims.  Defendant Bradley ultimately settled the charges for a $40,000 fine and three-year ban from participating in a penny stock offering.  Second, Wolfpack noted that Defendant Bradley was listed with Withrow as an inventor on "multiple" Data Vault Holdings patents, and that Withrow had pled guilty to making false statements upon being charged with participating in a pump and dump scheme during his ownership of Parallax Diagnostics, Inc., before it became Parallax Health and employed Defendant Bradley.

52.     On this news, Datavault AI's stock price fell $0.49 per share, or 19.44%, to close at $2.03 per share on October 31, 2025.

17

53.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Regulation S-K Item 105

54.     Throughout the Class Period, Datavault AI's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Datavault AI to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants failed to disclose, *inter alia*, the true economic value of the Company's purported partnerships with *inter alia* Burke, Scilex, and Nature's Miracle; the true level of trading activity on the Company's Datavault Platform, and Defendant Bradley's connections with convicted felon Withrow.  Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

### SCIENTER ALLEGATIONS

55.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  ***During the Class Period, the Individual Defendants enriched themselves by selling 38,065,752 shares of Datavault AI common stock for over $73.8 million in proceeds***. Defendant Bradley sold 37,925,251 shares of Datavault AI common stock, collecting proceeds of approximately $73.8 million; Defendant Moyer sold 139,527 shares of Datavault AI common stock, collecting proceeds of approximately $67,872; and Defendant Williams sold 890 shares of Datavault AI common stock, collecting proceeds of approximately $1,504.

18

56.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Datavault AI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Datavault AI securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Datavault AI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Datavault AI;

- whether the Individual Defendants caused Datavault AI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Datavault AI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

20

63.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Datavault AI securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Datavault AI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

66.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

21

67.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Datavault AI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Datavault AI securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Datavault AI securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Datavault AI's finances and business prospects.

70.      By virtue of their positions at Datavault AI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Datavault AI, the Individual Defendants had knowledge of the details of Datavault AI's internal affairs.

72.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Datavault AI. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Datavault AI's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Datavault AI securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Datavault AI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Datavault AI securities at artificially inflated prices and relied upon the price

of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.     During the Class Period, Datavault AI securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Datavault AI securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Datavault AI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Datavault AI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

24

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

76.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.    During the Class Period, the Individual Defendants participated in the operation and management of Datavault AI, and conducted and participated, directly and indirectly, in the conduct of Datavault AI's business affairs.  Because of their senior positions, they knew the adverse non-public information about Datavault AI's misstatement of income and expenses and false financial statements.

78.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Datavault AI's financial condition and results of operations, and to correct promptly any public statements issued by Datavault AI which had become materially false or misleading.

79.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Datavault AI disseminated in the marketplace during the Class Period concerning Datavault AI's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Datavault AI to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Datavault AI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Datavault AI securities.

25

80.     Each of the Individual Defendants, therefore, acted as a controlling person of Datavault AI.  By reason of their senior management positions and/or being directors of Datavault AI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Datavault AI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Datavault AI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Datavault AI.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 5, 2026                                   Respectfully submitted,

                                                          DONOVAN LITIGATION GROUP, LLC

                                                          */s/ Michael D. Donovan*

                                                          Michael D. Donovan (SBN 51895)

26

1885 Swedesford Road
Malvern, PA 19355
Telephone: (610) 647-6067
mdonovan@donovanlitigationgroup.com

POMERANTZ LLP
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

WOHL & FRUCHTER LLP
Joshua E. Fruchter*
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*

**Pro hac vice* applications forthcoming